## STARR COPITHORNE *vs.* FRAMINGHAM UNION HOSPITAL.

Middlesex. November 4, 1987. — March 14, 1988.

Present: HENNESSEY, C.J., WILKINS, LIACOS, ABRAMS, LYNCH & O'CONNOR, JJ.

*Negligence,* Hospital. *Proximate Cause.*

For the purposes of considering a motion for summary judgment in a civil
    action, the judge properly assumed that the defendant hospital owed a
    duty of care to its employee, the plaintiff, who had reasonably relied
    on a physician's good standing and reputation in the hospital community
    in choosing that physician to treat her, and the judge also properly
    assumed that the hospital violated this duty by failing to take sufficient
    disciplinary action in response to previous allegations of the physician's
    sexual misconduct with female patients. [862] LYNCH, J., and O'CON-
    NOR, J., dissenting, were each of opinion that the hospital owed no duty
    of care to the plaintiff in the circumstances. [866-868, 869-870]
The risk of future sexual assault by a physician on his female patients could
    properly be found by a jury to be within the range of foreseeable conse-
    quences resulting from a hospital's alleged negligence in continuing the
    physician's staff privileges after the hospital had received actual notice
    of allegations of the physician's previous sexual assaults on his patients
    both on and off hospital premises, including an incident in a patient's
    home. [865] LYNCH, J., dissenting.
A plaintiff seeking damages from the hospital in which she had been em-
    ployed, who alleged that she had suffered physicial and emotional injuries
    when her physician drugged and raped her, and who also alleged that
    she had relied on the physician's good standing as a visiting staff physi-
    cian in the hospital when choosing that physician to treat her, demon-
    strated a question of material fact whether the hospital's negligent failure
    to take sufficient disciplinary action with regard to allegations of the
    physician's previous sexual assaults on his female patients was the prox-
    imate cause of her injuries. [865-866] LYNCH, J., dissenting.

CIVIL ACTION commenced in the Superior Court Department
on April 11, 1985.

The case was heard by *Hiller B. Zobel,* J., on a motion for
summary judgment.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Judith E. Beals* for the plaintiff.

*Karen M. Moran* for the defendant.

HENNESSEY, C.J. The plaintiff brought an action in the Superior Court seeking damages for physical and emotional injuries suffered when her physician, Murray H. Helfant, drugged and raped her.[1] Her complaint included one count against Helfant and another against the hospital where she was employed as a technologist and Helfant was a visiting staff physician. Copithorne alleged that the hospital was negligent in continuing Helfant's staff privileges after it knew or should have known that he "posed a risk of harm to women." The sole issue before us is the propriety of the grant of summary judgment in favor of the hospital. See Mass. R. Civ. P. 56, 365 Mass. 824 (1974). Because we conclude that a jury reasonably could find that the hospital's negligence proximately caused Copithorne's injuries, we reverse and remand this case to the Superior Court.

For purposes of our review of the grant of summary judgment in favor of the hospital, we assume the truth of the facts set forth in Copithorne's affidavits or otherwise asserted in answers to interrogatories. See, e.g., *Coveney* v. *President of the College of the Holy Cross,* 388 Mass. 16, 17 (1983), and case cited. We summarize the facts so shown. At the time of the incident, Helfant was a practicing neurosurgeon and a visiting staff member of the hospital. He was not a hospital employee, but had been affiliated with the hospital for about seventeen years, having been reappointed to the visiting staff each year since his initial appointment. Copithorne was a hospital employee. In the course of her employment, she injured her back, and, aware of Helfant's reputation within the hospital as a good neurosurgeon and a specialist in back injuries, she sought his professional assistance. In the course of treating her, Helfant made a house call to Copithorne's apartment, where he com-

---

[1] Helfant was convicted in 1985 of rape and of drugging a person for unlawful sexual intercourse. On appeal, we affirmed the judgments of conviction. *Commonwealth* v. *Helfant,* 398 Mass. 214 (1986).

mitted the drugging and rape for which he was convicted and which caused the injuries for which Copithorne seeks compensation.

For purposes of his consideration of the hospital's motion for summary judgment, the judge below assumed, without deciding, that the hospital had been negligent in retaining Helfant on its staff. We think that a jury reasonably could find that the hospital owed a duty of care to Copithorne, as an employee who, in deciding to enter a doctor-patient relationship with Helfant, reasonably relied on Helfant's good standing and reputation within the hospital community, and that the hospital violated this duty by failing to take sufficient action in response to previous allegations of Helfant's wrongdoing.

We therefore turn to the proximate cause issue on which the judge based his ruling. The judge ruled that, as a matter of law, the hospital's negligence could not be the proximate cause of Copithorne's injuries because "[t]he independent misdeeds of Helfant, who was not at the time acting on the Hospital's behalf, broke the causal chain. Moreover . . . the Hospital could not reasonably foresee that he would rape someone off the Hospital premises. Even if it could, we cannot say that the withdrawal of Hospital privileges would have prevented the rape." If any one of these rulings was correct, then the judge properly granted the hospital's motion for summary judgment. We think, however, that all the rulings were erroneous.

The first two rulings really advance only a single proposition, and the issue as to each is the foreseeability of Helfant's act. The intervening criminal act of a third party is a superseding cause which breaks the chain of proximate causation only where the original wrongdoer reasonably could not have foreseen such act. See, e.g., *Mullins* v. *Pine Manor College,* 389 Mass. 47, 62-63 (1983), and cases cited. Therefore, our consideration of the propriety of these rulings reduces to a single inquiry into the foreseeability of Helfant's act.

Copithorne asserted that, at the time of the incident, the hospital had received actual notice of at least two previous incidents involving allegations that Helfant had sexually assaulted hospital patients. The first was reported to the hospital

by one Kathleen. Kathleen met with James W. Walckner, the hospital's executive vice president, and Dr. John Byrne, its chief of surgery, and also submitted a handwritten memorandum detailing her allegations. She informed the hospital that she had been admitted to the hospital for severe back pain and referred to Dr. Helfant for treatment. While she was in the hospital, Helfant more than once came in late at night, sat at her bedside, and engaged in "close physical contact with [her], consisting primarily of stroking [her] face, neck and chest . . . . The contact carried sexual innuendo[e]s and was entirely unauthorized." After she was discharged from the hospital, she went to Helfant's office, where Helfant asked that she enter his examining room, remove her clothing, and don a patient gown. After examining her back, he turned off the lights, removed her patient gown, and caressed her body. On another occasion, she was at home when she developed severe muscle spasms. Her roommate called Helfant, who came to the apartment and examined Kathleen's back. Indicating that her muscles were still tense, he injected her with ten milligrams of the drug Valium.[2] He then turned off the lights in her bedroom, sat down on her bed, partially undressed her, and proceeded to caress her body. The next day, Kathleen's roommate told her that, after leaving Kathleen's bedroom, Helfant tried to seduce the roommate, who asked him to leave.

In her memorandum to Walckner and Dr. Byrne, Kathleen indicated that she had not resisted Helfant's advances, and that she had mixed feelings about her experiences with him. Although she did not want to bring legal charges against Helfant, she wanted to be assigned to a different neurosurgeon, and "to discuss if any similar charges have arisen against Dr. Helfant"; and she wanted the hospital administration and the medical profession's board of ethics to be made aware of the situation. She stated that Helfant's actions had damaged her significantly, although not irretrievably, "but what Dr. Helfant could be

---

[2] Helfant also administered an injection of five to ten milligrams of Valium to Copithorne. It was this injection which was the basis of his conviction for drugging a person for unlawful sexual intercourse. See *Helfant, supra* at 219.

doing to other female patients who have different needs, priorities or senses of self is the most basic and fundamental issue that should be addressed [and] dealt with accordingly." She filed a complaint against Helfant with the Board of Registration in Medicine, and sent a copy of the complaint to the hospital.

In response to Copithorne's interrogatories, the hospital stated that it had taken action with regard to Kathleen's allegations. After meeting with Kathleen, Dr. Byrne met with Helfant, who denied any wrongdoing. Dr. Byrne then instructed Helfant to have a chaperone present in the future when visiting female patients in the hospital. Based on Helfant's "excellent record" at the hospital, Dr. Byrne "felt that no further action was necessary as it was his opinion that he had no need to worry about Dr. Helfant harming a patient. In effect, Dr. Helfant was given an oral warning." Dr. Byrne also told the nurses on the floor to "keep an eye on Dr. Helfant." Walckner "inquired of hospital personnel, through department heads at management meetings, if there was any awareness of sexual harassment at the hospital in general involving either employees or patients." Following receipt of a copy of Kathleen's letter to the Board of Registration in Medicine, Walckner wrote to the board, but received no response, and took no further action.

It also was shown that Walckner's inquiry as to hospital personnel's awareness of other instances of sexual harassment at the hospital brought to his attention another incident involving allegations of sexual assault by Helfant. This incident was reported in a nursing record, and repeated in an intra-hospital memorandum, and involved a female patient who for reasons of confidentiality was referred to only as "Jane Doe." According to these records, Doe used her call button to summon a nurse. The nurse found her "crying and upset." Doe asked the nurse, "What kind of a Doctor is Dr. Helfant?" She asked the nurse if Helfant was supposed to examine parts of her body, "like my breasts, or move my leg over to the other side of the bed. His fingers were doing only what my boyfriend should do." The nurse reported this incident to her supervisor, who "felt fairly confident" that she in turn had called the hospital's

administrator-on-call. The intra-hospital memorandum said that the nurse felt that Doe was "lucid and sincere, credible, at the time she reported the alleged incident."

Copithorne also stated that, at the time of the incident, the hospital knew or should have known of at least one other previous incident, this one involving an allegation that Helfant sexually assaulted a patient by the name of Linda. After Linda's discharge from the hospital, she told her sister Jane that, while she was in the hospital, Helfant had kissed her and put his tongue in her mouth, and that, on four separate occasions, "Helfant had taken Linda out of her fourth floor ward room late at night and brought her to a room on the first floor of the hospital," where he locked the door and raped her, later returning her to the fourth floor. Jane spoke to a night nurse at the hospital about these incidents. In her affidavit, she stated that she did not remember everything she told the nurse, but that she specifically remembered that she did at least complain about the fact that Helfant had been kissing Linda. The incidents involving Linda were the subject of a criminal complaint brought against Helfant. In a jury-waived trial, Helfant was found not guilty of these charges.

The facts asserted, if proved, would justify a jury's finding that the risk of injury to Copithorne was within the range of foreseeable consequences of the hospital's negligence in continuing Helfant's staff privileges. Where the hospital had received actual notice of allegations that Helfant had sexually assaulted patients, both on the hospital premises and off the premises in his office and in a patient's home, and yet took only the limited measures indicated, it was not unforeseeable that Helfant would continue to act in a consistent, if not worse, manner. Since there is a substantial question of fact as to whether the hospital's negligence proximately caused Copithorne's injuries, the judge erred in ruling that, as a matter of law, Helfant's act was unforeseeable and so constituted a superseding cause relieving the hospital of liability for its negligence.

The judge also erred in ruling that, as a matter of law, the withdrawal of Helfant's staff privileges would not have prevented

his drugging and raping Copithorne. Copithorne asserted that, by reason of her employment, she was aware of Helfant's good reputation within the hospital, and that she relied on this reputation in entering into a doctor-patient relationship with him; that, as an employee, any change in Helfant's status would have become known to her; and that, if she had had any reason to know that the hospital had suspended Helfant's staff privileges or imposed any disciplinary sanctions on him, she would not have entered into a doctor-patient relationship with him. A different question would be presented if a member of the general public claimed that the hospital was liable for similar harm simply because Helfant was a staff member and should not have been. But Copithorne's assertions amply demonstrate that there is a question of material fact as to whether the hospital's negligence in failing to take sufficient action with regard to previous allegations of Helfant's wrongdoing proximately caused Copithorne's injuries.

We therefore reverse the grant of summary judgment to the defendant, and remand the case to the Superior Court for further proceedings.

*So ordered.*

LYNCH, J. (dissenting). I dissent for the following reasons. First, I do not agree that the hospital owed a duty to Copithorne in the circumstances of this case. The existence of a duty is an essential prerequisite to liability for negligence. Yet no decision in Massachusetts, or elsewhere of which I am aware, imposes a duty of care in similar circumstances.

The court's reliance on *Mullins* v. *Pine Manor College,* 389 Mass. 47, 62-63 (1983), is misplaced. In *Mullins,* a college student was raped on campus as a result of the college's negligent provision of security measures. The duty discerned there was grounded on two principles of law. First, a duty of the college, found in "existing social values and customs," to protect the security and well-being of its resident students, and second, on the notion that the college, once having undertaken

to provide security measures, was duty-bound to provide those measures with due care. See *id*. at 51-54.

It may very well be that a hospital owes the patients of a visiting staff physician, who are also under its care, a similar duty. It cannot be said, however, that existing values and customs establish a duty of the hospital to protect its patients from the criminal acts of independent physicians occurring off the hospital premises and arising from a private and independent doctor-patient relationship. On the contrary, existing values and customs compel the conclusion that no such duty exists. The hospital is under no more obligation to such a physician's patient than Pine Manor College would have been if that rape had occurred off campus during a holiday or vacation. Even those States that have imposed a direct duty of care on a hospital with respect to the patients of staff physicians, where the traditional doctrine of respondeat superior would have absolved the defendant, have not gone so far as to impose civil liability on a hospital for an act committed off the hospital premises. See cases cited in Note, Hospital Corporate Liability: An Effective Solution to Controlling Private Physician Incompetence?, 32 Rutgers L. Rev. 342, 360-367 (1979). Where the doctrine of corporate liability has been applied to impose liability on a hospital for the negligence of staff physicians who are independent contractors, it has been done because of the duty of care that the hospital owes to *its* patients. "The hospital's liability is based on a duty of care owed by the institution directly to patients to ensure their safety and welfare while *within its confines*" (emphasis supplied). *Id*. at 360. To extend a hospital's duty of care for physicians' acts occurring off hospital premises is not only not based on existing values and customs but, also, it seems to me, contrary to both good policy and common sense. Sound policy may suggest that a hospital have some responsibility for acts occurring on its premises in order to ensure that a hospital exercises care in supervising the activities that occur within its boundaries. Since it can have no control over the activities that occur off hospital premises, imposing liability would only increase the already skyrocketing cost of inpatient hospital care (see Schramm, A State-Based

Approach to Hospital-Cost Containment, 18 Harv. J. on Legis.
607, 609-614 [1981]), because of conduct over which the hos-
pital has no control. I can see no justification for hospital
patients' ameliorating (by paying the hospital's charges) the
risks attendant upon a private doctor-patient relationship simply
because a given physician has been granted visiting staff
privileges by the hospital. The plaintiff's allegations that she
would not have consulted Dr. Helfant had he not had staff
privileges in spite of the fact that she had known him for four
years, had a brief affair with him, and worked with him in a
professional relationship until the events in question do not
require imposing such liability. Therefore, I would hold the
hospital had no duty to protect the plaintiff from the risk of
being raped in her own home by a fully accredited neurosurgeon
who was a member of the hospital's visiting staff.

I also conclude that no act of the hospital was the proximate
cause of the plaintiff's injuries. Basic tort principles teach that
the intentional and unforeseeable criminal act of a third party
is a superseding intervening cause. Restatement (Second) of
Torts § 448 (1965). J.R. Nolan, Tort Law § 204, at 320 n.51
(1979), and cases cited.

It is not enough to declare that the doctor's actions were
"foreseeable" and that, hence, there is no obligation to deal
with the question of proximate cause. What events are foresee-
able necessarily depends upon the underlying conduct of the
defendant. Here that conduct was the hospital's failure to re-
voke the physician's staff privileges in the face of allegations
of sexual misconduct on hospital premises. Certainly if fair
investigation of these complaints indicated that there was reason
to believe that the misconduct complained of had taken place
and no remedial action had been taken, it would have been
foreseeable that similar incidents might recur. In this instance,
however, the hospital responded to the complaints by prohibit-
ing Helfant from unchaperoned contact with its female patients.
If the hospital had failed to act, it may have been foreseeable
that Helfant would commit sexual assaults on hospital premises,
but the hospital's response would appear to have eliminated
that possibility. Helfant's hospital staff privileges had no rela-

tion to Helfant's ability to assault his private patients sexually in their homes or at his office. That opportunity existed in the absence of his visiting staff privileges. Since that is so, Helfant's criminal acts were not legally foreseeable and the hospital's failure to terminate his staff privileges cannot be the legal cause of the plaintiff's injuries because they were caused by the intervening or superseding criminal act of a third person. Therefore, no legal or proximate cause exists.


O'CONNOR, J. (dissenting). I do not agree with Justice Lynch that the hospital was entitled to summary judgment on the ground that there is no substantial question of material fact bearing on proximate causation. I do agree with him, however, that the hospital did not owe a duty to the plaintiff to exercise care for her safety in her home. Summary judgment for the hospital should be affirmed.

"There can be negligence only where there is a duty to be careful," *Theriault* v. *Pierce,* 307 Mass. 532, 533 (1940); and whether there is a duty to be careful is a question of law. *Monadnock Display Fireworks, Inc.* v. *Andover,* 388 Mass. 153, 156 (1983). *Scandura* v. *Trombly Motor Coach Serv., Inc.,* 370 Mass. 612, 618 (1976). See *Schofield* v. *Merrill,* 386 Mass. 244 (1982). In determining whether the law ought to provide that a duty of care is owed by one person to another, we look to existing social values and customs, and to appropriate social policy. *Id.* at 246-254. I agree with Justice Lynch that the imposition on a hospital of a duty of care to nonhospital patients off the hospital premises has no source in existing social values and customs and, particularly because of its likely adverse effect on the cost of hospital care, is unsound public policy. I am aware of no case in which such a duty has been imposed.

As the Supreme Court of Washington said in the case of *Pedroza* v. *Bryant,* 101 Wash. 2d 226, 236 (1984) (en banc), "[t]he hospital holds itself out to the community as a competent provider of medical care. The hospital does *not* hold itself out as an inspector or insurer of the private office practices of its

staff members. The delineation of staff privileges by the hospital can only affect the procedures used by staff members while they are inside hospital walls. The public [including employees of the hospital] cannot reasonably expect anything more." (Emphasis in original.)