CAROLYN V. PETRELL *vs.* M. THOMAS SHAW & others.[1]

Suffolk. November 4, 2008. - March 16, 2009.

Present: MARSHALL, C.J., IRELAND, SPINA, COWIN, CORDY, & BOTSFORD, JJ.

*Practice, Civil,* Summary judgment. *Constitutional Law,* Establishment of religion, Freedom of religion. *Jurisdiction,* Ecclesiastical controversy. *Fiduciary. Agency,* Scope of authority or employment. *Negligence,* Vicarious liability, Duty to prevent harm.

In a civil action brought against the Episcopal Diocese of Massachusetts and three of its bishops (defendants), alleging various claims in connection with the plaintiff's involvement in a sexual relationship with the rector of her parish, the Superior Court judge did not err in granting summary judgment in favor of the defendants on the plaintiff's claim of breach of fiduciary duty, where the material facts were insufficient to establish that the defendants stood in the type of relationship to the plaintiff from which a fiduciary duty could arise under civil law [382-383]; further, where there was clearly no evidence to support any allegation that the rector was acting within the scope of his employment duties when he engaged in a sexual relationship with the plaintiff, the judge properly granted summary judgment in favor of the defendants on the plaintiff's claim of vicarious liability [383-384].

In a civil action brought against the Episcopal Diocese of Massachusetts and three of its bishops (defendants), alleging claims of negligent hiring, supervision, and retention of a rector with whom the plaintiff became involved in a sexual relationship, the trial court judge did not err in granting summary judgment in favor of the defendants, where there was no genuine issue of material fact that the defendants were negligent in any respect. [384-388]

CIVIL ACTION commenced in the Superior Court Department on June 22, 2001.

The case was heard by *Christopher J. Muse,* J., on motions for summary judgment.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Donald L. Gibson* for the plaintiff.

*Charles P. Kindregan* for the defendants.

---

[1]Barbara C. Harris, Roy F. Cederholm, Jr., and the Episcopal Diocese of Massachusetts (diocese). Three other defendants, August A. Rakoczy, Bradford N. Burgess, and Christ Church Parish of Plymouth, Inc. (Christ Church), are no longer part of this case.

IRELAND, J. We transferred this case from the Appeals Court on our own motion to determine whether a judge in the Superior Court erred in granting summary judgment for the defendants, the Episcopal Diocese of Massachusetts (diocese) and three of its bishops, where the plaintiff, Carolyn V. Petrell, filed an action making various claims against them in connection with her involvement in a sexual relationship with August A. Rakoczy, the then rector of her parish, Christ Church Parish of Plymouth, Inc. (Christ Church). Because we conclude that the material facts, when viewed in the light most favorable to the plaintiff, are insufficient to establish that the diocese and the bishops committed a breach of any legal duty they may have owed to the plaintiff, we affirm.

1. *Background and procedure.* We present the essential undisputed facts, as well as inferences drawn from them in the light most favorable to the plaintiff. See *Attorney Gen.* v. *Bailey,* 386 Mass. 367, 371, cert. denied, 459 U.S. 970 (1982).

The diocese, a Massachusetts charitable corporation, is one diocese within the Protestant Episcopal Church of the United States of America (PECUSA), a hierarchical church. Governed by its own constitution and canons, the diocese is also bound by PECUSA's national constitution and canons. The diocese is presided over by a bishop whose responsibilities include ensuring that each constituent parish conducts its affairs according to the diocesan constitution and canons. The bishop is assisted by the bishop suffragan. M. Thomas Shaw became bishop of the diocese in 1995 and held that position throughout the period relevant to this case. Barbara C. Harris served as bishop suffragan of the diocese from 1989 until 2000; and Roy F. Cederholm has served as bishop suffragan since March, 2001.

Each constituent parish of the diocese is organized as a separate corporate entity, governed by a vestry of laypersons. The vestry elects representatives who manage the day-to-day parish affairs. The vestry also hires a priest to serve as its parish rector. The diocese provides pastoral and spiritual support to the parishes, but neither the members of the vestry nor any of its representatives are diocesan employees. The constitution and canons of PECUSA dictate that each Episcopal parish owes ecclesiastical and spiritual allegiance to its bishop, its diocese, and PECUSA.

Christ Church Parish (parish) is a constituent parish of the Massachusetts diocese.

In 1996, the parish began a search for a new rector, and Rakoczy was one of the candidates. After a series of interviews with Rakoczy, the parish vestry "called" him as its new rector. Rakoczy and the parish entered into a letter of agreement describing Rakoczy's duties, responsibilities, and compensation as rector.

In keeping with canonical procedures, the diocese was concerned with certain aspects of the hiring process. Relevant to this case, the diocese arranged for the Oxford Document Management Company (Oxford) to conduct a background investigation, which was accomplished by sending detailed questionnaires to all employers, schools, and dioceses with which Rakoczy had had any prior contact. This investigation did not elicit any responses suggesting that Rakoczy had engaged in any inappropriate sexual conduct. Shaw also telephoned the former bishop of the diocese where Rakoczy had worked in Pittsburgh, and was told that Rakoczy had experienced "some sort of breakdown" in connection with the failure of his marriage, but had recovered fully.

Because Rakoczy was transferring his canonical residence from Pittsburgh, the diocese accepted the transfer only when it received a "letter dimissory" from the bishop of the Diocese of Pittsburgh affirming that Rakoczy was a priest in good standing, and that he had not been "justly liable to evil report for error in religion or viciousness of life, for the last three years." As required by the diocese, Rakoczy also confirmed that he had attended training concerning sexual misconduct awareness. After the parish vestry had "called" Rakoczy, he met with Harris, the bishop suffragan, to become acquainted with, and to initiate his pastoral and ecclesiastical relationship with, the diocese.

The plaintiff was a thirty-five year old married member of the parish. In May, 2000, she approached Rakoczy for counselling regarding concerns she had about the daughter of her sister-in-law. During their initial meeting, Rakoczy indicated that he could "easily fall in love" with the plaintiff. The following day, the plaintiff began regular meetings with Rakoczy concerning her own marital problems. She moved out of her marital home some two weeks later, and in early June, 2000, began a sexual

relationship with Rakoczy. The plaintiff filed a complaint for divorce on June 26, 2000.

In September, 2000, a parishioner who was a trainer for the diocese sexual awareness misconduct policy (trainer), told the coordinator of the diocese's education program concerning sexual misconduct awareness (coordinator)[2] that she suspected that Rakoczy was "getting involved with a woman in the parish." The trainer stated that she wished to remain anonymous and that she did not want to identify the woman she suspected as involved with Rakoczy; she did not inform the coordinator that the unidentified woman was being counselled by Rakoczy. That same month, the coordinator relayed the information to Shaw. As requested, the coordinator did not identify the trainer. Shaw told the coordinator that he could not "respond to hearsay and rumors of suspicions from anonymous people," noting that there was no suggestion "that anything illegal was occurring." Shaw asked her to have someone with first-hand knowledge of any sexual relationship with Rakoczy contact him.

In March, 2001, the coordinator again informed Shaw of a report that Rakoczy was inappropriately involved with an unidentified female parishioner, adding that "there were perhaps two or three other people that may be involved." She again told Shaw that her informant continued to insist on anonymity. Shaw again asked whether she could "get somebody to come forward," emphasizing that she "bend every effort" to encourage the anonymous informant to come directly to him. Again, no one did so.

In April, 2001, the plaintiff ended her relationship with Rakoczy. Ten days later, Rakoczy appeared at her home and threatened to commit suicide. The plaintiff telephoned the police, and Rakoczy was admitted to a psychiatric facility. Cederholm, at the time in charge of the diocese because Shaw was on a sabbatical leave, learned of Rakoczy's hospitalization from a member of the parish vestry. Soon thereafter, Cederholm learned that Rakoczy had been involved in a sexual relationship with the plaintiff. Cederholm immediately commenced the diocesan

---

[2]In an affidavit filed in support of the defendants' motion for summary judgment, Bishop M. Thomas Shaw stated that the coordinator had acted as a consultant to the diocese in the past, but at the times relevant to this case was no longer affiliated with the diocese. The disputed fact is not material.

process of ecclesiastical discipline of Rakoczy. Rather than defend against the charge, Rakoczy agreed to submit to ecclesiastical discipline by renouncing his vows and being "deposed" of the priesthood. Consistent with Episcopalian requirements, Cederholm addressed the parish's congregation. Without identifying the plaintiff by name, he informed the congregation that Rakoczy had been involved in a sexual relationship with a parishioner and had been hospitalized, and that Rakoczy would be renouncing his vows and would be deposed of the Episcopal priesthood.

The plaintiff thereafter filed her complaint in this action, making the following claims: against the diocese and the bishops, negligent hiring, supervision, and retention of Rakoczy; against the diocese, Shaw, and Cederholm, breach of fiduciary duty; against the diocese, vicarious liability; and against Shaw, failure to enforce diocesan policies.[3] A judge in the Superior Court allowed the defendants' motions for summary judgment on all counts. Judgment entered for the diocese and the bishops, and the plaintiff appealed.

2. *Discussion.* a. *Summary judgment.* Summary judgment is appropriate when there is no genuine issue of material fact and the moving parties are entitled to judgment as a matter of law. *Kourouvacilis* v. *General Motors Corp.*, 410 Mass. 706, 716 (1991); Mass. R. Civ. P. 56 (c), as amended, 436 Mass. 1404 (2002). The moving parties may satisfy their burden of demonstrating the absence of a triable issue either by submitting evidence that negates an essential element of the opposing party's case or by demonstrating that the opposing party has no reasonable expectation of proving an essential element of his case at trial. *Flesner* v. *Technical Communications Corp.*, 410 Mass. 805, 809 (1991). Ordinarily, summary judgment is not an appropriate means to resolve claims of negligence because the question is usually one of fact. *Mullins* v. *Pine Manor College*, 389 Mass. 47, 56 (1983). However, a judge may decide the issue as a matter of law when no rational view of the evidence permits a finding of negligence. *Id.*

Our consideration of the plaintiff's appeal is informed by "bedrock principles" of the First Amendment to the United

---

[3]The plaintiff also made a claim against Cederholm alleging that he portrayed her in a false light.

States Constitution. *Maffei* v. *Roman Catholic Archbishop of Boston*, 449 Mass. 235, 243 (2007) (*Maffei*). The First Amendment "places beyond our jurisdiction disputes involving church 'doctrine, canon law, polity, discipline, and ministerial relationships.' " *Id.*, quoting *Williams* v. *Episcopal Diocese of Mass.*, 436 Mass. 574, 579 (2002). See *Hiles* v. *Episcopal Diocese of Mass.*, 437 Mass. 505, 515-516 (2002) (courts lack jurisdiction over dispute between parish and diocese over discipline of clergy). The First Amendment does not grant religious organizations absolute immunity from tort liability. We nevertheless proceed cautiously lest we become embroiled in disputes involving a religious organization that would require us to interpret or weigh church doctrine. It is in light of these jurisprudential principles that we consider the plaintiff's claims in this case.

b. *Breach of fiduciary duty.* The plaintiff argues that the diocese, Shaw, and Cederholm committed a breach of a duty of care that they owed her, as a parishioner, to protect her from sexual exploitation by a clergy member to whom she turned for counselling.[4] We disagree. The undisputed facts, when viewed in the light most favorable to the plaintiff, do not establish that the diocese and the bishops stood in the type of relationship to the plaintiff from which a fiduciary duty could possibly arise under civil law. As is clear from the record and the plaintiff's own allegations, the only relationship she had with the diocese and Shaw was that of a parishioner (like every other parishioner) within the diocese; her only contact with Cederholm occurred after her relationship with Rakoczy had ended, as we shall now describe.

Following Rakoczy's hospitalization, Cederholm met with Rakoczy, the plaintiff, the parish vestry, and the congregation of Christ Church to provide support and to begin the ecclesiastical discipline process that would lead to Rakoczy's deposition from priesthood. As discussed, Cederholm addressed the congregation as required by the ecclesiastical process, but in all other respects sought only to ascertain the facts and to provide religious sustenance to the plaintiff after the relationship that had ended. Viewing these facts in the light most favorable to the plaintiff,

---

[4]Because Rakoczy is no longer a party, we need not address the nature of the duty, if any, he may have owed the plaintiff under civil law as a result of a religious counselling relationship with her. See note 9, *infra*.

there is no evidence that any of the diocese and the bishops assumed the role of "counsellor" to the plaintiff or otherwise agreed to act on her behalf.

In *Maffei, supra,* we held that the First Amendment would "clearly forbid our consideration of the religious obligations, if any, of a clergy member to his or her congregants, or of the 'trust and confidence' that may be engendered in congregants solely by virtue of the clergy's religious authority." *Id.* at 244. We further explained that "[a] ruling that a Roman Catholic priest, or a member of the clergy of any (or indeed every) religion owes, a fiduciary-confidential relationship to a parishioner that inheres in their shared faith and nothing more is impossible as a matter of law." *Id.* at 249. Our holding in *Maffei* precludes the plaintiff's claim for breach of fiduciary duty against the diocese and the bishops; any alleged relationship between the plaintiff and each of the diocese, Shaw, and Cederholm was based on no more than their shared religious affiliation and her role as a parishioner in a parish within the diocese. However consequential that may be in a religious context, it provides no basis to support liability in a civil context.

The plaintiff's reliance on the case of *Moses* v. *Diocese of Colo.,* 863 P.2d 310 (Colo. 1993), is misplaced. In that case, a parishioner who had sexual relations with her parish priest from whom she had sought counselling later met with and turned to the bishop of the Episcopal Diocese of Colorado. *Id.* at 317. The bishop, who knew that the parishioner was "fragile" and had "a pathological sense of guilt," assumed the role of a counsellor to her, exerted substantial influence over her, and took control of the matter of her relationship with her priest. *Id.* at 322-323. The Supreme Court of Colorado concluded that these facts supported a jury's finding that the Colorado bishop had assumed a duty to act in good faith on the parishioner's behalf, and had then committed a breach of that duty. *Id.* at 323. Here there is no evidence that the diocese or any of the bishops assumed any counselling role with respect to, agreed to act on behalf of, or to give advice to the plaintiff. We therefore need not decide whether, in factual circumstances different from these, we would agree with the Colorado court. There simply is no duty owed here to the plaintiff.

c. *Vicarious liability.* We affirm the grant of summary judg-

ment in favor of the diocese and the bishops on the plaintiff's claim for vicarious liability. Liability on those grounds "is the proposition that an employer, or master, should be held vicariously liable for the torts of its employee, or servant, committed within the scope of employment." *Dias* v. *Brigham Med. Assocs.*, 438 Mass. 317, 319-320 (2002). There is no evidence to support any allegation that Rakoczy was acting within the scope of his employment duties when he engaged in a sexual relationship with the plaintiff. The evidence was clearly to the contrary, as we now describe.

At his deposition, Rakoczy testified that his relationship with the plaintiff violated "the basic teachings" of the Episcopal Church; the instructions he had received as part of the sexual misconduct training program were consistent with these teachings. At his deposition, Cederholm, in turn, testified that any sexual relationship between a priest and parishioner was improper and would subject the priest to discipline. Cederholm also testified that in such a relationship, the priest "bears the burden of maintaining proper boundaries and proper relationships with parishioners," explaining that when the boundaries are not adhered to, a priest "can be considered to be exploiting someone for his or her own purposes."

As the foregoing makes clear, Rakoczy's sexual relationship with the plaintiff was not within the scope of his employment as rector, and could not rationally be viewed as such. See *Doe* v. *Purity Supreme, Inc.*, 422 Mass. 563, 568 (1996) (rape and sexual assault by assistant store manager of employee not within scope of employment); *Worcester Ins. Co.* v. *Fells Acres Day Sch., Inc.*, 408 Mass. 393, 404-405 (1990) (sexual misconduct by day care employees not within scope of employment for purposes of vicarious liability). See also *N.H.* v. *Presbyterian Church (U.S.A.)*, 998 P.2d 592, 599 (Okla. 1999) ("Our survey of national jurisprudence reveals that the majority of jurisdictions considering the issue of sexual contact between an ecclesiastic officer and a parishioner have held that the act is outside the scope of employment as a matter of law").[5]

d. *Negligent hiring, supervision, and retention.* We affirm the

---

[5]We also reject the plaintiff's argument that the defendants were not entitled to judgment as a matter of law because of ratification. See *Pinshaw* v.

judge's grant of summary judgment in favor of the diocese and the bishops as to the plaintiff's claims of negligent hiring, supervision, and retention. A plaintiff seeking to hold a defendant liable in negligence must establish that the defendant owed the plaintiff a legal duty, and that a breach of that duty proximately caused injury to the plaintiff. *Davis* v. *Westwood Group*, 420 Mass. 739, 742-743 (1995), and cases cited. Whether a duty exists is a question of law. *Id.* In this case, we need not consider whether any duty was owed by the diocese and the bishops to the plaintiff for any alleged negligent hiring, retention, or supervision of a parish priest, because there is no genuine issue of material fact that the diocese and the bishops were negligent in any respect.[6]

Concerning hiring, it was the parish vestry, and not the diocese, that "called" Rakoczy to become its rector, and entered into an employment contract with him. Even assuming that the diocese's role in commissioning or conducting a background check on Rakoczy was sufficient to show that the diocese "hired" him, no rational jury could conclude that the diocese and the bishops overlooked or ignored any evidence suggesting that Rakoczy

*Metropolitan Dist. Comm'n*, 33 Mass. App. Ct. 733, 735 (1992), quoting *White* v. *Apsley Rubber Co.*, 194 Mass. 97, 99 (1907) ("It is a well-established principle that an employer is not only liable for torts committed by its servants acting within the scope of their employment but, 'by ratification may become responsible for such acts when committed in excess of their authority' "). Here, viewed in the light most favorable to the plaintiff, no reasonable inference could be drawn that would suggest Shaw ratified Rakoczy's conduct after being made aware of the allegation of the relationship in September, 2000, or that Cederholm ratified the conduct after learning of the relationship in April, 2001. It is undisputed that Shaw urged the coordinator to have a person with first-hand knowledge contact him on both occasions when he heard the allegation of Rakoczy's relationship with a parishioner. It is also without dispute that Cederholm only learned of the relationship after it had already ended, and took prompt action to discipline Rakoczy.

[6]Courts that have considered this point are divided on whether the First Amendment to the United States Constitution bars a claim for negligent hiring, supervision, and retention against a religious institution based upon the sexual misconduct of a member of its clergy. Compare, e.g., *Malicki* v. *Doe*, 814 So. 2d 347, 365 (Fla. 2002) (First Amendment does not "shut the courthouse door" on parishioners' claims of negligent hiring, supervision, and retention arising from church's alleged failure to prevent harm by clergy who sexually assaults and batters minor or adult parishioner), with *L.L.N.* v. *Clauder*, 209 Wis. 2d 674, 687 (1997) (First Amendment bars claim of negligent supervision under facts of case that would have required court to interpret church law and policy).

would engage in a sexual relationship with an adult parishioner. The background check, conducted as required by church policy, revealed no such facts.[7] Also in accordance with church policy, the diocese confirmed that Rakoczy had attended training designed to prevent sexual misconduct, provided by his previous employer.

In short, the plaintiff presented no facts even suggesting that, at the time he was hired by the parish, Rakoczy had a history of sexual misconduct that the diocese and the bishops could have discovered through reasonable investigation. Cf. *Copithorne* v. *Framingham Union Hosp.*, 401 Mass. 860, 862-866 (1988) (hospital committed breach of duty of care where doctor drugged and raped hospital employee, and evidence indicated that hospital may have known of at least two prior instances of sexual misconduct by doctor). *Moses* v. *Diocese of Colo.*, 863 P.2d 310 (Colo. 1993), on which the plaintiff relies, is not apt. There, before the offending priest was hired, the diocese possessed a psychological report that concluded that the priest had a "sexual identification ambiguity." *Id.* at 328. Another psychological report indicated that he had a "problem with depression and suffered from low self-esteem." *Id.* These reports, the court held, "gave the Diocese a reason to believe [the priest] should not be put in a position to counsel vulnerable individuals." *Id.* The plaintiff points to no comparable facts in this case.

Concerning the plaintiff's claim of negligent supervision and retention, on appeal she claims only that Shaw responded insufficiently to the reports from the coordinator to him.[8] Assuming, without deciding, that the diocese and the bishops had any duty of supervision, no rational jury could find that the diocese and bishops were negligent in supervising or retaining Rakoczy. As discussed, while Rakoczy and the plaintiff were involved in a sexual relationship, a relationship they sought to keep secret, the coordinator twice informed Shaw of an anonymous report that Rakoczy was involved in a sexual relationship with an unidentified parishioner. The coordinator did not report that the unidenti-

---

[7]One document appearing in the record was a form completed by Rakoczy, in which he stated that he once had an altercation with someone who had been stalking him. Even if material, there is no evidence that the diocese or the bishops were provided with this information.

[8]The plaintiff's claim of negligent retention is based on the same evidence as her claim of negligent supervision.

fied parishioner was being counselled by Rakoczy. On each occasion, Shaw urged her to encourage any person (including the source of the anonymous report) to come forward. Shaw's actions were in accordance with diocese's sexual misconduct policy manual, which provides:

"Anyone who believes that he or she has been subject to sexual misconduct by a priest or church employee in the diocese may make a complaint to either the Bishop, the Assistant to the Bishop for Pastoral Concerns, or the Standing Committee of the diocese. If the complainant is willing to make a charge of sexual misconduct, that charge must be in writing to the Bishop, who will then begin the process of investigating and adjudicating the charge. Charges will not be processed unless they are in writing."

The plaintiff does not allege that the policy was deficient in any respect, therefore we need not address whether the First Amendment would bar recovery.

The delicate balance between the freedom to exercise religion and the demands placed on all persons (clerical and others) by civil law requires us to proceed cautiously in a controversy where we are asked to hold that a religious institution's reliance on its own written policy governing the response to reports of a clergy's sexual misconduct with an adult parishioner gives rise to liability under civil law.[9] On the facts presented here, where the diocese adhered to its articulated policy; where there is no claim that its policy was unreasonable; where the plaintiff was an adult; and where she argues only that the sexual conduct in which she and Rakoczy engaged was proscribed by ecclesiastical law, we con-

[9]Courts that have considered whether a member of the clergy can be liable under civil law for a sexual relationship with an adult parishioner that occurs during a counselling relationship proscribed only by ecclesiastical law have reached different results. Compare F.G. v. MacDonell, 150 N.J. 550, 565 (1997) ("Ordinarily, consenting adults must bear the consequences of their conduct, including sexual conduct. In the sanctuary of the church, however, troubled parishioners should be able to seek pastoral counselling free from the fear that the counsellors will sexually abuse them"), with Roppolo v. Moore, 644 So. 2d 206, 208 (La. Ct. App. 1994) ("[T]hey were both adults. As there is no civil nor criminal prohibition against such conduct between adult laypersons the State cannot penalize such conduct because [it involved] an Episcopal priest").

clude that the plaintiff has not met her burden to show a genuine issue of material fact that the diocese and the bishops negligently supervised or retained Rakoczy.

*Judgment affirmed.*