NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-13380

NORVELLA HILL-JUNIOUS, individually and as administratrix,[1]  vs.
UTP REALTY, LLC.


Norfolk.      April 3, 2023. – August 16, 2023.

Present:  Budd, C.J., Gaziano, Lowy, Kafker, Wendlandt,
& Georges, JJ.


Wrongful Death.  Consortium.  Negligence, Wrongful death,
     Causing loss of consortium, One owning or controlling real
     estate, Duty to prevent harm, Foreseeability of harm.
     Practice, Civil, Wrongful death, Summary judgment.



     Civil action commenced in the Superior Court Department on
February 12, 2019.

     The case was heard by Paul D. Wilson, J., on a motion for
summary judgment.

     The Supreme Judicial Court on its own initiative
transferred the case from the Appeals Court.


     Matthew C. Hanson for the plaintiff.
     Robert P. Powers for the defendant.
     Christopher Maffucci, for Massachusetts Association of
Realtors, amicus curiae, submitted a brief.
     Frank J. Bailey, Selena Fitanides, & John C. La Liberte,
for PioneerLegal, LLC, amicus curiae, submitted a brief.


_____

     [1] Of the estate of Drake Scott, Jr.

GEORGES, J.  In the early morning hours of February 17, 2016, Drake Scott, Jr., was shot and killed outside the exit door of City Limits Saloon (City Limits or nightclub), a nightclub leasing space in a commercial property in Randolph. Scott's mother, plaintiff Norvella Hill-Junious, filed this negligence action in the Superior Court against the current owner of the property, defendant UTP Realty, LLC (UTP),[2] seeking damages for wrongful death and loss of consortium.  This appeal concerns whether summary judgment was appropriately granted in favor of UTP.

The plaintiff contends that the granting of summary judgment to UTP was inappropriate because there was a dispute of material fact whether UTP knew or should have known about prior acts of violence at the nightclub, so as to create a duty to protect the decedent from the risk of violence on the property,

---

[2] The plaintiff named the prior owner of the property, TJB, LLC, as a defendant in her original complaint, but she subsequently filed an amended complaint naming only UTP and the owner of the nightclub, City Limits, Incorporated, as defendants.

City Limits, Incorporated, was defaulted on May 27, 2020, for failing to respond to a final request to answer interrogatories.  See Mass. R. Civ. P. 33 (a) (4), as appearing in 436 Mass. 1401 (2002).  On March 21, 2022, judgment entered in favor of the plaintiff against City Limits, Incorporated, in the amount of $810,013.35.  See Mass. R. Civ. P. 55 (b) (2), as amended, 463 Mass. 1401 (2012).  City Limits, Incorporated, did not file a notice of appeal.

specifically, the premeditated killing by a third party.  In support of this assertion, the plaintiff relies on her expert witness's proffer that it would be unreasonable for a commercial landlord like UTP to purchase a property with a nightclub on it without first inquiring about past violent acts on the property.

We conclude that, viewing the record in the light most favorable to the nonmoving party, the execution-style shooting of the decedent was not reasonably foreseeable to UTP in its capacity as property owner and landlord, and there was thus no duty on the part of UTP to protect the decedent against this criminal act by a third party.  Accordingly, we affirm the summary judgment in favor of UTP.[3]

1.  Background.  We summarize the uncontroverted facts in the summary judgment record, along with evidence viewed in the light most favorable to the nonmoving party -- in this case, the plaintiff -- reserving some facts for later discussion.  See Williams v. Board of Appeals of Norwell, 490 Mass. 684, 685 (2022).

This case concerns a commercial property located at 324-326 North Main Street in Randolph (property) that leases commercial space to various local businesses.  In January 2013, the property was owned by TJB, LLC (TJB).  At that time, Uyen Phan

_____

[3] We acknowledge the amicus briefs submitted by the Massachusetts Association of Realtors and PioneerLegal, LLC.

opened a nail salon on the first floor of the property. Another tenant, City Limits, operated a nightclub out of the basement floor of the property. City Limits had its own building entrance, which opened onto a right-of-way serving abutters to the property as well as an adjacent parking lot.

The record indicates that a number of violent disturbances and criminal incidents occurred at the property in the period after Phan's nail salon began leasing space from TJB, many with connections to City Limits. In 2013, there was a fight in the property's parking lot and an assault inside City Limits. In 2014, there were reports of multiple fights occurring on the property, a drug-related arrest outside City Limits, windows broken by a baseball bat-wielding patron of City Limits, and a shooting of three individuals outside City Limits. In May 2015, gun shots were reported by a patron of the nightclub, and police found shell casings in the parking lot. In December of that year, another incident occurred, during which a patron of the nightclub was hit on the head with a bottle.

In September 2015, Phan formed UTP for the purpose of buying the property from TJB. In November 2015, approximately three months prior to the decedent's death, TJB sold the property to UTP, and at the time of the sale assigned City

Limits's lease to UTP, in addition to all other rights and agreements attached to the property.[4]

On the evening of February 16, 2016, City Limits held an "open mic" live music event in which the decedent participated. The shooter, Gregory Wright, saw the decedent at the nightclub and formed a plan to shoot him in retaliation for the death of Wright's brother; Wright believed the decedent was involved in his brother's death. At least two members of the security staff at the nightclub were working at the nightclub that night. The nightclub's procedure was to search everyone entering the nightclub when security staff was working, and one security staff member remained at the entrance to the nightclub throughout the night. Security staff members who were present that night reported that Wright had approached them and asked whether the door to the nightclub was "the only exit." The

---

[4] Under the terms of its lease, City Limits was solely responsible for its operations and contractually obligated to "carry on and conduct its business upon the Premises [of the property] in compliance with all local, [S]tate, and [F]ederal laws." The lease provided that the common areas of the property were "at all times . . . subject to the exclusive control and management of the Landlord," who must maintain them in a "clean manner, in broom-swept condition free from trash and personal effects." Also, under the terms of the lease, City Limits was required to carry comprehensive general liability insurance with a minimum limit of $1 million for injury or death that named the landlord as an additional insured party. Finally, the lease contained a provision indemnifying UTP "of and from all . . . actions, claims, . . . [and] liabilities . . . of any nature." The lease, however, did not place any obligation on UTP to provide security for City Limits or its patrons.

security staff member who answered thought the question was "strange."[5]

After midnight, while patrons were leaving City Limits as it closed, the decedent left the nightclub and stopped to speak to a few people outside its door.  At that point, Wright, who had left the nightclub and was present outside the front entrance, shot and killed him.[6]  Police responded to the gunshots within seconds, as they were already in the area.  After a short foot chase, police captured Wright, and he was later convicted of murder in the first degree in connection with the incident.  Phan was not present at the property on the night of the murder.  She did not know the decedent or Wright, or anything about their relationship to or knowledge of each other.

---

[5] Shortly after midnight, an unidentified woman approached Michael Tuitt, an off-duty Randolph police officer who was at the nightclub, and told him that she had overheard a man in a group near the restrooms state, "[T]he kid who killed my family member is here and . . . he is going to get dealt with after the club."  Tuitt alerted the head of the security staff at City Limits about the woman's comment and notified police.  Separately, at about midnight, a former member of the security staff recommended that the police be contacted when the nightclub owner asked whether he heard anything about "problems about to occur in the parking lot."

[6] The parties agree that the murder occurred outside City Limits "at the edge of a right of way adjacent to 326 North Main Street used in common with other abutters."  A police report described the decedent's body as lying on the pavement "approximately seven feet outside of the front door of" City Limits.

Following the shooting, the licensing board of Randolph (board) held a hearing, during which the board received evidence of police reports concerning City Limits and heard testimony from police officers.  On April 12, 2016, the board issued a decision in which it made factual findings and concluded that the hours during which City Limits could sell alcohol should be reduced.  In its findings, the board detailed the nightclub's "pattern of operation that caused the [police] to have concerns about its management."  These concerns involved not only numerous police calls regarding the nightclub, but also its "failure to notify the [police]" about criminal activity.  The board's decision detailed a number of the incidents that had occurred at the nightclub, as well as its disregard of attempts that the police had made to suggest tactics that the nightclub could use to mitigate outbreaks of violence.  In particular, prior to the shooting, police officers had counselled City Limits against the use of "open mic" nights, opining that such events were likely to give rise to violence at the nightclub.

In February 2019, the plaintiff, as administrator of her son's estate, brought this action for wrongful death and loss of consortium against UTP.[7]  The plaintiff alleged that given the history of criminal incidents at the property, UTP knew or

_____

[7] See note 2, _supra_.

should have known of the potential dangers and threat of violence caused by the nightclub's tenancy; UTP therefore had a duty to undertake reasonable security measures to deter against such foreseeable violence. UTP's breach of this duty, the plaintiff alleged, resulted in the decedent's death.

During her deposition, Phan denied having any knowledge, at the time that she was considering purchasing the property, of the violent incidents or criminal activity that had occurred on the property.[8] At the close of discovery, UTP moved for summary judgment, arguing that the decedent's murder was not reasonably foreseeable, and therefore, no duty of care existed between UTP and the decedent. UTP also argued that, even if it had implemented security measures on the property, no such reasonable measures would have prevented the decedent's death.

The plaintiff opposed UTP's motion, reiterating her argument that because Phan knew or should have known of the prior criminal incidents at City Limits, the decedent's murder was a reasonably foreseeable risk that gave rise to a duty on the part of UTP. The plaintiff also contended that although the decedent's murder was premeditated, the question whether

---

[8] Phan acknowledged speaking with police in March 2016, when police executed a search warrant for two units of the property in connection with suspected human trafficking activity. However, she denied having knowledge of any of the alleged human trafficking activity prior to that conversation with police.

additional security measures would have prevented the decedent's death was a question of fact for a jury.

A partially agreed-to statement of material facts was submitted in connection with the motion for summary judgment, as well as jointly submitted exhibits. These exhibits included Phan's deposition, the board's decision, and the report of Russell Kolins, a security expert proffered by the plaintiff. Kolins opined that security at City Limits was deficient in several respects and that UTP had "failed to fulfill its duties as a commercial property landlord," by failing to provide adequate lighting and security for the property's common areas and by failing to conduct a risk assessment of the property, which would have uncovered the ways in which City Limits "deviated from accepted security standards." After a hearing on the motion, the judge issued a decision allowing UTP's motion for summary judgment.

In his decision, the judge concluded that UTP did not have a duty to protect the decedent from the shooting because such an event was not foreseeable. The judge observed that there was no affirmative evidence in the record that Phan knew or should have known of the prior criminal activities at City Limits and noted that the plaintiff did not cite any precedent in support of her claim that a commercial landowner has a duty to inquire about any history of past criminal activity on its property. The

judge did not reach UTP's alternative argument that no reasonable security measures would have prevented the shooting. A final judgment entered dismissing the complaint as to UTP, and the plaintiff appealed. We transferred the case to this court on our own motion.

2. Discussion. "We review a grant of summary judgment de novo." Medina v. Hochberg, 465 Mass. 102, 105 (2013). "Summary judgment is appropriate when, 'viewing the evidence in the light most favorable to the nonmoving party, all material facts have been established and the moving party is entitled to a judgment as a matter of law.'" Id., quoting Augat, Inc. v. Liberty Mut. Ins. Co., 410 Mass. 117, 120 (1991). To be successful, a moving party "may satisfy [its] burden of demonstrating the absence of a triable issue either by submitting evidence that negates an essential element of the opposing party's case or by demonstrating that the opposing party has no reasonable expectation of proving an essential element of [her] case at trial." Petrell v. Shaw, 453 Mass. 377, 381 (2009), citing Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991). Once the moving party has met this burden, the opposing party is "required to respond by 'set[ting] forth specific facts showing that there is a genuine issue for trial.'" Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991), quoting Mass. R. Civ. P. 56 (e), 365 Mass. 824 (1974).

"A viable negligence claim requires a showing that a defendant owes a duty of reasonable care to the plaintiff, the defendant committed a breach of that duty, the plaintiff suffered damage, and a causal relationship existed between the breach of duty and the damage."  Heath-Latson v. Styller, 487 Mass. 581, 584 (2021).  "[T]he existence of a duty is a question of law, and is thus an appropriate subject of summary judgment." Jupix v. Kask, 447 Mass. 141, 146 (2006).

We have observed that "the existence of a duty of care depends upon the foreseeability of a risk of harm that the defendant has an ability to prevent."  Heath-Latson, 487 Mass. at 584, citing Lev v. Beverly Enters.-Mass., 457 Mass. 234, 243 (2010).  In the case of a commercial landowner, this includes "a duty to take reasonable precautions to protect persons lawfully in common areas of rental property against reasonably foreseeable risks."  Whittaker v. Saraceno, 418 Mass. 196, 198 (1994), citing Restatement (Second) of Torts § 360 (1965). Generally, this duty does not extend "to taking 'affirmative steps to protect against dangerous or unlawful acts of third persons.'"  Heath-Latson, supra, quoting Luoni v. Berube, 431 Mass. 729, 731 (2000).  "A landlord is not free, however, to ignore reasonably foreseeable risks of harm to tenants, and others lawfully on the premises, that could result from unlawful intrusions into common areas of the leased premises."

Whittaker, supra at 197. Thus, in appropriate circumstances, a landlord "may be liable for ignoring criminal activities that occur on premises and were known or should have been known to [the landlord]." Griffiths v. Campbell, 425 Mass. 31, 34 (1997). "[T]he cases in which we have imposed liability are those in which a person legally on the premises is attacked, and the owner or landlord knew of or should have known of both the previous attacks and the potential for a recurrence based on a failure to take measures to make the premises safer." Id. at 35.

"Notions about what should be foreseen . . . are very much interwoven with our feelings about fair and just limits to legal responsibility." Whittaker, 418 Mass. at 198, quoting 4 F. Harper, F. James, Jr., & O. Gray, Torts § 20.5, at 136-137 (2d ed. 1986). As a result, "[a]ll the circumstances are examined in defining the scope of a duty of care based on the reasonable foreseeability of harm." Whittaker, supra at 199, citing Flood v. Southland Corp., 416 Mass. 62, 72 (1993). "The previous occurrence of similar criminal acts on or near a defendant's premises is a circumstance to consider, but the foreseeability question is not conclusively answered" by evidence of such acts. Whittaker, supra.

"The word 'foreseeable' has been used to define both the limits of a duty of care and the limits of proximate cause."

Whittaker, 418 Mass. at 198, citing 4 F. Harper, F. James, Jr., & O. Gray, Torts § 20.5, at 139. "As a practical matter, in deciding the foreseeability question, it seems not important whether one defines a duty as limited to guarding against reasonably foreseeable risks of harm or whether one defines the necessary causal connection between a breach of duty and some harm as one in which the harm was a reasonably foreseeable consequence of the breach of duty." Whittaker, supra at 198-199. See Belizaire v. Furr, 88 Mass. App. Ct. 299, 304-305 (2015).

On review of the summary judgment record, we conclude that the execution-style murder that occurred here was not a reasonably foreseeable risk that UTP had the ability to prevent, and therefore, UTP had no duty to protect the decedent against this sudden, unanticipated act of violence. To begin, there was no evidence "that the defendant was affiliated in any way with, or knowledgeable about, the [perpetrator] or any dispute that the [perpetrator] may have had with the [decedent]." Belizaire, 88 Mass. App. Ct. at 305. Rather, the record suggests that the shooting was not related in any way to Phan, UTP, the property, or City Limits, and that it only occurred there because the perpetrator happened upon the decedent there that evening.

Of course, UTP's duty is not circumscribed by what it knew; the duty also encompasses what it should have known. The

plaintiff relies heavily on the evidence of prior acts of violence at the property to argue that the harm that occurred here was reasonably foreseeable. However, even if UTP should have known of the prior acts of violence identified by the plaintiff, that would not be conclusive on the question of duty. Whittaker, 418 Mass. at 199. See Mullins v. Pine Manor College, 389 Mass. 47, 56 (1983), citing Samson v. Saginaw Professional Bldg., Inc., 393 Mich. 393, 406-407 (1975) ("Prior criminal acts are simply one factor among others that establish the foreseeability of the act of [a] third party"). We must also consider whether the harm that the plaintiff claims was foreseeable is one "that the defendant has an ability to prevent." Heath-Latson, 487 Mass. at 584. Here, the record cannot reasonably support a conclusion that security measures, including those suggested by the plaintiff's expert, such as additional exterior lighting and an additional security presence near the nightclub's exit, would have prevented the shooting that occurred.[9] See Petrell, 453 Mass. at 381. To the contrary, the record indicates that despite the presence of security staff at the nightclub and, specifically, on duty at the entrance

---

[9] Given our conclusion on this point, the plaintiff's proffer of expert evidence -- to the effect that UTP failed to act as a reasonably prudent commercial landlord by failing to inquire upon purchase about the risk profile of the property and to implement the suggested security measures -- does not suffice to create a genuine issue of material fact.

where the shooting took place, Wright brazenly devised and executed his plan to shoot the decedent, even going so far as to ask security staff whether the door to the nightclub was "the only exit" in the hours before shooting the decedent. And no rational basis exists to conclude that lighting could have prevented the killing.

It is a well-established principle that a landlord "is not a guarantor of the safety of persons in a [property's] common area." Whittaker, 418 Mass. at 197. "The possibility of criminal conduct occurring is present in almost every aspect of daily life. In that sense the possibility of a violent attack is always able to be foreseen." Id. at 200. The law, however, does not "place the burden of all harm caused by random violent criminal conduct on the owner of the property where the harmful act occurred, without proof that the landowner knew or had reason to know of a threat to the safety of persons lawfully on the premises against which the landowner could have taken reasonable preventive steps." Id. See Luisi v. Foodmaster Supermkts., Inc., 50 Mass. App. Ct. 575, 579 (2000) (affirming summary judgment for commercial property owner as to allegations of inadequate security where "no reasonable preventive measures taken by the defendants could have prevented the sudden and unprovoked attack on the plaintiff"). Such proof is lacking in the summary judgment record here.

3.  Conclusion.  Based on the foregoing, we conclude that the targeted, execution-style shooting that occurred here was not reasonably foreseeable to UTP; therefore, UTP had no legal duty to prevent it.  Accordingly, we affirm the summary judgment entered in favor of UTP.

So ordered.